# UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| JAMES D. KENSIK and ARTHUR | ) | |
| TONELLI, on behalf of themselves and all | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case Number _____ |
| | ) | |
| JP MORGAN CHASE & CO., J.P. | ) | |
| MORGAN CLEARING CORP., J.P. | ) | |
| MORGAN SECURITIES INC., J.P. | ) | |
| MORGAN FUTURES INC., HSBC | ) | |
| HOLDINGS PLC, HSBC SECURITIES | ) | |
| (USA) INC., HSBC BANK USA NATIONAL | ) | |
| ASSOCIATION, and JOHN DOES 1-10., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs James D. Kensik and Arthur Tonelli ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against JP Morgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities Inc., J.P. Morgan Futures Inc. (collectively "JP Morgan") as well as HSBC Holdings PLC, HSBC Securities (USA) Inc. and HSBC Bank USA National Association (collectively "HSBC"). In support of their claims against JP Morgan and HSBC (collectively, "Defendants"), Plaintiffs allege the following:

## SUMMARY OF CLAIMS

1.     This action arises from Defendants' manipulation and restraints of trade in connection with the market for United States exchange-traded financial instruments backed by silver bars that are deliverable on the London Bullion Market Association ("LBMA") and against the silver futures contract traded on the COMEX and GLOBEX platforms of the CME Group, Inc. (hereinafter "exchange-traded silver bar financial instruments").

2.     Exchange-traded silver bar financial instruments, which are described more fully below, are securities traded on the New York Stock Exchange – Arca ("NYSE-Arca") and futures and options traded on the CME Group, Inc.'s ("CME") electronic "GLOBEX" and open-outcry COMEX platforms (collectively referred to as "CME/COMEX"). The Class, defined below, traded the following exchange-traded silver bar financial instruments:

> (i) CME/COMEX exchange-traded Silver futures ("SI") and options. Each contract represents a future interest or obligation in silver bars certified for delivery by COMEX.

> (ii) NYSE-Arca exchange-traded iShares Silver Trust ("SLV") securities. Each SLV share represents a present interest in LBMA certified silver bars owned by the SLV investors.

> (iii) NYSE-Arca exchange-traded ETF Securities Silver Trust ("SIVR") securities traded on NYSE-Arca. Each SIVR share represents a

2

present interest in LBMA certified silver bars owned by the SIVR investors.

3.     The LBMA and CME/COMEX exchanges determine the qualities of silver bars that are good for delivery on those exchanges. The silver bars approved for delivery by the LBMA and CME/COMEX are identical in weight and purity, and the silver bar manufacturer "brands" approved by each exchange overlap materially. Silver bars certified for delivery against the CME/COMEX financial instruments are virtually identical to silver bars certified for delivery on the LBMA (which are owned by investors in the NYSE-Arca silver bar financial instruments). For this reason, investors who buy or sell silver bar financial instruments in either the NYSE-Arca or CME/COMEX exchange-traded silver bar financial instruments are similarly impacted when the price of a troy ounce of silver is artificially manipulated.

4.     Plaintiffs bring this action on behalf of the following Class:

All persons or entities who bought or sold NYSE-Arca or CME/COMEX exchange-traded silver bar financial instruments during the period March 1, 2008 to the present (the "Class Period"). Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries and co-conspirators.

5.     As explained in more detail below, during the Class Period, Defendants conspired to intentionally, unlawfully and artificially suppress, and have in fact intentionally, unlawfully and artificially suppressed, the prices of exchange-traded silver bar financial instruments.

6.     During the Class Period, the prices of CME/COMEX silver futures, SLV and SIVR (after its inception in July 2009) fell and rose together.  For example, around the beginning of the Class Period, on March 14, 2008, the CME/COMEX front futures contracted traded at $20.574 per troy ounce and SLV traded at $20.42 per share (representing an interest in one troy ounce). By October 24, 2008, the CME/COMEX front futures contract dropped to $9.25 per troy ounce and SLV dropped to $9.13 per share.  On January 8, 2010, the CME/COMEX front futures contract traded at $18.458 per troy ounce, SLV traded at $18.15 per share, and SIVR traded at $18.48 per share (representing one troy ounce).  Because the prices of exchange-traded silver bar financial instruments move in tandem, the artificial components of such prices also move in tandem.

7.     Plaintiffs, on behalf of themselves and the Class, allege violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. On behalf of Class members who traded only NYSE-Arca silver bar financial instruments, and to the extent Defendants' conduct was in connection with a purchase or sale of securities as defined by that Act, Plaintiffs allege violations of the anti-manipulation provisions of the Securities Exchange Act, 15 U.S.C. § 78i.  On behalf of Class members who traded only CME/COMEX silver bar financial instruments, and to the extent Defendants' conduct was in connection with a commodity contract or a commodity underlying the contract, Plaintiffs allege violations of the anti-manipulation provisions of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1, *et seq.*

8.      In this case, the vast majority of trading on CME/COMEX and NYSE-Arca was electronic. While electronic trading was intended to allow for greater efficiency and "freer" markets, it has actually provided greater opportunities to restrain trade in the markets and manipulate prices. Rather than being visible in an "open outcry" pit and subject to the scrutiny of fellow market participants, the vast majority of trading is electronic, involving traders who sit at computer-trading terminals and place orders anonymously. Thus, unlike where pit or open-outcry trading is the dominant form of placing offers and bids, nothing prevents potential manipulators in this market from signaling or outright communicating with each other to drive the market in any direction they deem fit, or from posting sham orders that are intended to drive prices in an artificial way. In other words, because of electronic trading, market participants are generally unable to police one another. Thus, defendants JP Morgan and HSBC, had an opportunity to communicate and signal to each other their market moves (*i.e.*, conspire and manipulate) without detection by other market participants.

9.      As described below, since at least March 2008, Defendants have conspired and combined to manipulate downward the prices of exchange-traded silver bar financial instruments.

10.     Defendants have been the leading custodians and authorized participants of exchange-traded funds ("ETFs"), whose sole underlying assets are silver bars deliverable on the LBMA or against the CME/COMEX futures contracts. ETFs are investment trusts whose sole holdings on behalf of investors are silver

bars. They are intended to provide investors with a present interest in silver. Each share of the ETFs at represents an interest in one troy ounce of silver approved for delivery by the LBMA. Authorized participants trade their silver bars to the trust in exchange for the right to sell shares in the trust. The silver is held by the "custodian" of the trust.

11. Before the Class Period began, JPMorgan had become the custodian and an authorized participant of the largest known concentration of silver bars, the iShares Silver ETF, which holds in excess of 340 million troy ounces of silver, a sum that equals an estimated 1/3 of the total present global supply of silver bullion. As a result, it had actual knowledge of the precise whereabouts of much of the world's known silver bar supply.

12. In approximately March 2008, JP Morgan acquired Bear Stearns, which held a very large short position in silver. With more of the total short position in silver concentrated in the hands of JP Morgan, it had a further motive to suppress prices.

13. Upon information and belief, JP Morgan works together with HSBC, the other dominant player in the silver and precious metals markets. In July 2009, HSBC became the custodian of the SIVR ETF, which meant that it had physical access to and knowledge of the silver held by that trust. Notably, it named JP Morgan as one of the sub-custodians of the SIVR ETF.

14. As a result of their participation in the silver ETFs, JP Morgan and HSBC had a direct opportunity to confer and discuss with each other the prices of silver held by each of them.

15. In addition, Defendants had a strong incentive to suppress downward the price silver as measured by the NYSE-Arca and CME/COMEX instruments. For example, Defendants could pledge their silver to the ETFs in exchange for ETF shares, sell their shares to other market participants, drive down the prices of silver through trades on NYSE-Arca and CME/COMEX, buy back their ETF shares from investors at lower prices, and return their (now lower priced) silver ETF shares in exchange for the silver bars initially pledged against those shares, the real value of which remained the same, and only notionally appears lower because of Defendants' suppression.

16. With respect to Defendants' conduct on the CME/COMEX platforms, JPMorgan and HSBC's scheme has been corroborated by Andrew Maguire, a 40-year precious metals trading veteran. Mr. Maguire reported his findings to the Commodity Futures Trading Commission ("CFTC"), which commenced an investigation in 2008.

17. On October 26, 2010, CFTC Commissioner Bart Chilton stated that there had been "violations of the Commodity Exchange Act in the silver market" and "fraudulent efforts to persuade and deviously control" silver prices, and that these efforts "should be prosecuted."

18.     In addition, upon information and belief, the Antitrust Division of the United States Department of Justice is conducting a criminal investigation of silver market manipulation.

## THE PARTIES

19.     Plaintiff James D. Kensik is a citizen and resident of Chicago, Illinois. During the period from March 1, 2008 to the present, Kensik traded and sold CME/COMEX silver futures.

20.     Plaintiff Arthur Tonelli is a citizen and resident of Lemont, Illinois. During the period from March 1, 2008 to the present, Tonelli traded and sold SLV shares.

21.     Defendant J.P. Morgan Chase & Co. is a Delaware financial holding company with its principal place of business in New York and its principal retail financial services and commercial banking business in Chicago, Illinois.

22.     Defendant J.P. Morgan Securities Inc. ("JPMS") is a Delaware corporation and a wholly owned subsidiary of J.P. Morgan Chase & Co., with corporate offices in Chicago.  It, together with its subsidiary, J.P. Morgan Clearing Corp., provides securities and futures clearing services.

23.     Defendant J.P. Morgan Clearing Corp. ("JPMC"), formerly known as "Bear Stearns Securities Corp.," is a Delaware corporation and a subsidiary of J.P. Morgan Securities Inc., doing business in Illinois with its principal place of business in New York.  It provides securities and futures clearing services.

24.     Defendant J.P. Morgan Futures Inc. ("JPMFI") is a Delaware corporation with corporate offices in Chicago, Illinois.  JPMFI is a U.S. futures commission merchant and a wholly owned subsidiary of JPMorgan Chase & Co. JPMFI provides research, execution and clearing services in futures and options in commodity assets, including silver commodities.

25.     Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public limited company with its corporate headquarters in London, England.

26.     Defendant HSBC Securities (USA) Inc. ("HSBC USA") is a Delaware corporation and a wholly owned subsidiary of HSBC Markets USA Inc., which in turn is a wholly owned subsidiary of HSBC Holding plc.  HSBC USA does business in Illinois, has a corporate office in New York and is a registered securities broker-dealer and a CFTC-registered futures commission merchant.

27.     Defendant HSBC Bank USA, National Association ("HSBC NA") is a Texas company with an office in Wilmington, Delaware.

28.     Various other individuals and entities not named as Defendants in this Complaint participated and co-conspired in Defendants' artificial suppression and downward manipulation of the various silver exchange traded product prices.

## FACTUAL BACKGROUND ON THE SILVER MARKET

### Exchange-Traded Silver Bar Financial Instruments

29.     The exchange-traded silver bar financial instruments at issue are backed by refined silver cast in bars that (i) weigh 1000 troy ounces (with a weight tolerance of 10%), (ii) assay to a minimum of 999 fineness or purity, and (iii) are

branded by a silver supplier approved by the CME/COMEX and/or the LBMA. These silver bars are stored in warehouses.

30.     While silver may be further refined and employed for various industrial uses, the silver bars at issue in this case are investment grade and held for investment purposes.

31.     Transporting, warehousing and securing silver bars is costly. Accordingly, exchange-traded silver bar financial instruments provide a unique opportunity for investors to obtain a legal interest in silver bars without the attendant responsibilities of ensuring proper warehousing and security. Efficiencies are achieved by holding silver "on paper" and pooling storage and security costs with other investors in silver bars (such as in the ETF-custodian's warehouses or the CME/COMEX warehouses)

A.     "SLV" Shares and Options.

32.     The NYSE-Arca-traded iShares Silver Trust ("SLV") provides investors with a direct investment in investment-grade silver bars without the costs and risks of storing the bars. SLV is an exchange-traded fund that is sponsored by Barclays Capital, Ltd.  Investors own a fractional interest in silver pledged to the SLV trust by authorized participants.  In exchange for pledging silver, the authorized participants receive a basket of shares, each representing approximately one troy ounce of silver.  Authorized participants can then sell these shares to the investing public.

33.     SLV has been in existence since at least March 2008. The silver bars held by the SLV custodian, JP Morgan Chase, must meet the minimum LBMA certification standards described above.

34.     Since at least March 2008, JP Morgan has been the sole custodian of silver held by SLV.  As custodian, it is the physical warehouse of silver owned by SLV investors.  The custodian agreement between JP Morgan and SLV allows it to hold silver in its London vaults or elsewhere, such as the United States.

35.     Since at least March 2008, JP Morgan has also been an "authorized participant" in SLV.  As an authorized participant, JP Morgan can tender silver bars to the trust in exchange for a basket SLV shares, which it can then retain or sell to the investing public.  It can return the SLV shares to the SLV investment trust and withdraw or redeem the silver from the warehouse or tender it for other uses (such as covering short positions in CME/COMEX futures contracts).

36.     Currently, SLV investors hold in excess of 340 million troy ounces of silver bars, which equals approximately one third of the global supply of silver.

37.     There are currently approximately 350 million outstanding SLV investment shares, meaning each share represents approximately one troy ounce of silver. SLV shares may be purchased or sold short. In addition, investors may purchase or sell call and put options on SLV.  Average daily trading volume for SLV shares is 13.1 million.

B.    "SIVR" Shares and Options.

38.    NYSE-Arca-traded ETFS Physical Silver Shares ("SIVR") is the other ETF that provides investors with a direct investment in investment-grade silver bars without the costs and risks of storing the bars. SIVR, which has been in existence since July 2009, is an exchange-traded fund that is sponsored by ETF Securities USA, LLC. Investors in SIVR own a fractional interest in silver pledged to the SLV trust by authorized participants.

39.    The silver bars held by the SIVR custodian, HSBC, must also meet the LBMA certification standards described above.

40.    Since at least July 30 2009, HSBC has been the custodian of silver held by SIVR.   As custodian, it physically warehouses the silver owned by SIVR investors and is authorized to procure "sub-custodians."

41.    Since at least July 30, 2009, JP Morgan has been one of the authorized "sub-custodians" of SIVR silver held by HSBC.

42.    At present, SIVR investors hold in excess of 14.4 million troy ounces of silver bars. At present, approximately 14.1 million SIVR shares are outstanding, meaning each share represents approximately one troy ounce of silver.

43.    SIVR shares may be purchased or sold short. In addition, investors may purchase or sell call and put options on SIVR.  Average daily trading volume for SIVR is in excess of 130,000 shares.

C.   "SI" Futures and Options.

44.   Silver futures and options contracts are traded (i) electronically on the CME's GLOBEX platform and (ii) to a far lesser extent in open-outcry pits on the COMEX, which is a division of the New York Mercantile Exchange, which is a wholly owned subsidiary of the CME Group, Inc.

45.   CME/COMEX-traded silver futures ("SI") require the seller to make delivery and the buyer to accept delivery of 5,000 troy ounces of CME/COMEX-approved silver bars held in CME/COMEX-approved warehouses. Approximately 107 million troy ounces of silver are currently being held by CME/COMEX approved warehouses.

46.   Silver options contracts come in two forms, "silver calls" and "silver puts."

47.   A silver call entitles (but does not require) the buyer to take, and requires (it is not optional) the seller to make, delivery of a single silver futures contract in the specified delivery month at a specified strike price.

48.   A silver put entitles (but does not require) the buyer to make, and requires (it is not optional) the seller to take, delivery of a single silver futures contract in the specified delivery month at a specified strike price.

49.   While some silver trades take place in the COMEX open outcry pits, the vast majority of CME silver futures and options are traded electronically over the CME GLOBEX platform. GLOBEX is the proprietary trading platform of the CME, and is headquartered in Chicago.

**D.** **Short and Long Positions.**

50. A "long" position in silver financial instruments increases in value if the price of silver bars rise. A "short" position in the silver financial instruments at issue decrease in value of the price of silver bars rise.

51. Long and short positions in certified silver bars may be acquired in the following ways:

| Long | Short |
|------|-------|
| Buy an SLV share | Sell short an SLV share |
| Buy an SIVR share | Sell short an SIVR share |
| Buy an SI futures contract | Sell a silver futures contract |
| Buy an SLV call option | Sell an SLV call option |
| Buy an SIVR call option | Sell an SIVR call option |
| Buy an SI call option | Sell an SI call option |
| Sell an SLV put option | Buy an SLV put option |
| Sell an SIVR put option | Buy an SIVR put option |
| Sell an SI put option | Buy an SI put option |

**E.** **Covering Positions.**

52. Silver futures and options can be held until the delivery period, at which point in time the attendant rights may be exercised and the underlying obligations must be performed.

53. The overwhelming majority of positions (in excess of 90%) are "closed-out" or "covered" before the delivery period.

54. An investor who originally anticipated a decrease in prices (and obtained a short position as a result) but later observes prices unexpectedly increasing, would cover or offset the short position by obtaining an equal and identical long position:

| Examples of Covering Short Positions | |
|---|---|
| Instrument | How to Cover |
| Sold short SLV share | Buy SLV share |
| Sold SI future | Buy SI future |
| Sold SLV call option | Buy SLV call option at identical strike price |
| Sold SI call option | Buy SI call option at identical strike price |
| Bought SLV put option | Sell SLV put option at identical strike price |
| Bought SI put option | Sell SI put option at identical strike price |

55.     An investor who originally anticipated an increase in silver prices (and obtained a long position as a result) but later observed prices unexpectedly decreasing, would cover or offset the short position by obtaining an equal and identical long position.

| Examples of Covering Long Positions | |
|---|---|
| Instrument | How to Cover |
| Bought SLV share | Sell SLV share |
| Bought SI future | Sell SI future |
| Bought SLV call option | Sell SLV call option at identical strike price |
| Bought SI call option | Sell SI call option at identical strike price |
| Sell SLV put option | Buy SLV put option at identical strike price |
| Sell SI put option | Buy SI put option at identical strike price |

56.     The exchange-traded silver bar financial instruments at issue are tied to the same underlying commodity, silver bars that have been certified by the LBMA, CME/COMEX or both.

## THE SILVER BAR FINANCIAL PRODUCT MARKET
## IS HIGHLY SUSCEPTIBLE TO COLLUSION

57.     Defendants are the dominant participants in the markets for exchange-traded silver bar financial instruments. They are the only custodians of the silver ETFs, which means they have intimate knowledge of and direct

possession of the world's largest known concentrations of silver bars. Defendants are also authorized participants in NYSE-Arca traded Silver ETFs, SLV and SIVR.

58.     Defendants have also traditionally been among the few dominant players in the CME/COMEX precious metals markets, including the CME/COMEX silver markets. As explained below, Defendants held the majority of the short position in the CME/COMEX-traded instruments during the relevant time period.

59.     Defendants are also two of eleven market-making members of the LBMA, the trade association that acts as the coordinator for activities conducted on behalf of its members and other participants in the London bullion market. LBMA-approved silver is held by the SLV and SIVR ETFs.

60.     Because the NYSE-ARCA, CME/COMEX and LBMA silver markets present arbitrage opportunities, they are economically integrated by market participants, such that price movements in one impact movements in the other. Indeed, the per-troy ounce price movements in silver futures, SLV and (since its inception in July 2009) SIVR demonstrate an extremely strong degree of correlation. During the Class Period, the prices of CME/COMEX silver futures, SLV and SIVR (after its inception in July 2009) fell and rose together. For example, around the beginning of the Class Period, on March 14, 2008, the CME/COMEX front futures contracted traded at $20.574 per troy ounce and SLV traded at $20.42 per share (representing an interest in one troy ounce). By October 24, 2008, the CME/COMEX front futures contract dropped to $9.25 per troy ounce and SLV dropped to $9.13 per share. On January 8, 2010, the CME/COMEX front futures

contract traded at $18.458 per troy ounce, SLV traded at $18.15 per share, and SIVR traded at $18.48 per share (representing one troy ounce). Because the prices of exchange-traded silver bar financial instruments move in tandem, the artificial components of such prices also move in tandem.

61. JP Morgan and HSBC, as dominant players with respect to SLV, SIVR and SI futures and options, with the ability to make and time large trades, have an opportunity to work in concert and suppress prices.

62. Exchange-traded silver bar financial instruments are fungible. They each represent a financial interest in a specified amount of certified silver bars. For example, 5,000 shares of SLV represents an interest in 5,000 troy ounces, much like a CME/COMEX futures contract, which calls for the delivery of 5,000 troy ounces. NYSE-Arca and CME/COMEX impose rules for the incremental pricing of the instruments at issue. Bids and offers are made in an efficient, standardized market for these standardized contracts.

63. The anonymous electronic trading (compared to an open pit filled with human traders) on the NYSE-Arca and the CME/COMEX make illicit agreements difficult to detect and the participants impossible to identify. Electronic trading, where bids and offers are placed on an electronic ladder or matrix, facilitates signaling and other restraining conduct. Finally, in electronic markets such as these, large orders frequently dictate prices in the silver financial markets, as market makers are reluctant to go against the grain and increase their risk.

Because of their size and dominance in the market, Defendants are able to dictate prices through large orders.

64.     In addition to their shared roles as custodians and sub-custodians of the ETFs, and their roles as LBMA market makers, defendants are also major participants in silver industry associations whose members meet regularly. Defendants are members of the Futures Industry Association ("FIA") and the Futures and Options Association ("FOA"). JP Morgan and HSBC employees have been present at the same time at meetings of these associations. For example, the FIA's Board of Directors includes JPFMI managing director and global co-head of futures and options trading (Peter G. Johnson), and the HSBC managing director and head of futures trading (Robert T. Cox), and JP Morgan's Future and Options chairman (Richard Berliand) serves as special advisor to the Board. The FIA conducts regular meetings, including the annual Futures and Options Expo, Investor Education Day, and the International Derivatives Expo. The FOA conducts annual conferences such as International Derivatives Week.

## FACTS GIVING RISE TO THIS SUIT

65.     As described above, JP Morgan and HSBC are the dominant participants in the silver markets. As custodians, sub-custodians and authorized participants, JP Morgan and HSBC are the largest players with respect to the silver ETFs traded on NYSE-Arca.  They are also market-making members of the LBMA.

66.     In 2006, JP Morgan became the custodian of silver bars held by the SLV and gained physical possession of a vast quantity of the known supply of silver

bars, approximately 340 million troy ounces – or approximately one third of the known global supply. Because it can trade this silver by returning shares to the ETF, and because it knows the exact whereabouts and movements of this silver, JP Morgan has unique physical control over silver and unique access to intelligence concerning silver bars.

67. In March 2008, JP Morgan acquired Bear Stearns. At that time, Bear Stearns held large short positions in CME/COMEX silver futures and options. Upon information and belief, rather than unwinding the Bear Stearns short position, JP Morgan maintained and increased the position, thereby artificially driving down the price of silver futures.

68. Upon information and belief, JP Morgan maintained and increased its short position in CME/COMEX silver bar futures and options with the understanding that the other dominant player in silver, HSBC, would follow. In fact, HSBC did just that, increasing its short position as well. It was not in HSBC's rational economic self-interest to follow JP Morgan, however, because it could profit from the otherwise inevitable rise of silver prices by forcing JP Morgan to deliver silver bars against its short positions. Rather than doing so, however, HSBC accepted JP Morgan's signal and accumulated short positions.

69. By August 2008, JP Morgan and HSBC held a short position in 33,805 CME/COMEX silver futures contracts, which equals 85% of the commercial net short position in silver futures, and 25% of all (commercial and non commercial) short positions in silver futures. Defendants' single-month short position in August

equaled 25% of the annual silver mine production. Defendants, however, had no corresponding long position.  Without an understanding that each would act in a similar fashion with respect to these positions, acquiring and maintaining such significant short positions would have been economically irrational.

70.    In September 2008, the Division of Enforcement of the Commodity Futures Trading Commission began investigating silver market manipulation. By this time, the CFTC had been "besieged with emails from hundreds of investors who complained that they believed silver prices were being manipulated," according to an October 27, 2008 Wall Street Journal article.

71.    In the first quarter of 2009, HSBC held 40% of the precious metal derivatives (excluding gold) held by commercial banks. Also, upon information and belief based on facts revealed in the Office of Comptroller of the Currency Q1 2009 Quarterly Report, Defendants collectively held more than 96% of all precious metal derivatives held by U.S. banks (excluding gold) with a combined physical or spot market price value ("notional" value) of $7.9 billion.

72.    In July 2009, the SIVR ETF was formed and began trading on NYSE-Arca.  HSBC was named the custodian of SIVR investors' silver.  HSBC formed a "sub-custodian" agreement with JP Morgan, whereby JP Morgan could also take physical possession of the SIVR silver.  This agreement provided a further means for HSBC and JP Morgan to communicate regarding silver movements and silver prices.

73.    In November 2009, Andrew Maguire, a former Goldman, Sachs & Co. employee who traded in the silver markets in question, contacted the CFTC and reported Defendants' illegal conspiracy to suppress and manipulate downward the price of silver instruments. Maguire stated that JP Morgan silver traders had signaled market participants, including HSBC, in advance of their manipulation so that they, HSBC and other traders could reap profits from artificially suppressed silver prices. In other words, JP Morgan would signal its intention to cause a particular downward spike in prices.  The other market participants, like HSBC, would join, knowing that each would act consistently with one another, and that their collective moves would force prices downward.

74.    In a January 26, 2010 email to the CFTC, Maguire indicated that Defendants' signals were sent around the time of (a) the United States Department of Labor's Non Farm Payroll Reports; (b) at the time silver options expired; and (c) during periods of silver futures contract roll-overs.  These specific downward price suppressions are in addition to the general trend of price suppression beginning in March 2008 and continuing through the present.  In other words, during this period, the price of silver has been continuously suppressed by Defendants and their co-conspirators.  Specific trading activity, such as that noted by Maguire, has led to and deepened suppressed prices.

75.    On February 3, 2010, Maguire emailed the CFTC and stated that JP Morgan and HSBC had signaled the market that they intended to drive down the price of silver futures two days later, on February 5, 2010, when the United States

non-farm payroll employment data would be released. Maguire's email stated that silver would remain stagnant (if prices would otherwise increase because of the data), or drop (if they would otherwise remain flat), or fall further than expected (even if they would otherwise fall). Indeed, between February 3, 2010 and February 5, 2010, the price of silver dropped dramatically.

76.     In March 2010, Maguire made his emails to the CFTC public. Since that time, the CFTC, through its "Bank Participation Report," has confirmed that commercial banks have reduced their short position in silver contracts by approximately 30%. Upon information and belief, Defendants comprise the vast majority of bank participation in the silver market, and thus the vast majority of the decrease in short position holdings.

77.     The massive short positions taken by JP Morgan and HSBC during the Class Period would have been extremely risky and against economic self-interest had each not known that the other would support the position. As noted above, forcing a large short (such as JP Morgan) to make delivery would be the economically rational decision in a situation such as that presented here, when there is a limited quantity of the underlying physical commodity, large portions of which are tied up in the hands of a limited few (such as the silver ETFs). Furthermore, because the silver price was already low according to historic standards, and because it was a desirable asset in otherwise troubled economic times, there was no rational basis for HSBC not to force JP Morgan to deliver against its short position.

22

78.     Defendants' conduct caused the prices of exchange-traded silver bar financial instruments to become artificially suppressed.  As a direct and proximate cause of Defendants' conduct, Plaintiff and the Class paid more for short positions and received less for long positions than they would have in the absence of said conduct.

79.     On or about May 9, 2010, it was reported that the Department of Justice was conducting an investigation into JP Morgan's silver trading on CME/COMEX.

80.     According to an October 27, 2010 Wall Street Journal article, by early 2010, the CFTC was investigating Maguire's emails and began interviewing JP Morgan metals traders.

81.     In October 26, 2010, CFTC Commissioners Bart Chilton (one of five Commissioners) announced that there have been "violations of the Commodity Exchange Act in the silver market," "fraudulent efforts to persuade and deviously control" silver prices, and that these efforts "should be prosecuted."

82.     On October 27, 2010, the Wall Street Journal reported that the CFTC's "enforcement staff has circulated a packet of information to CFTC lawyers and commissioners, outlining some of its findings in the silver probe, including documents that could suggest there have been attempts to manipulate prices."

83.     Price movements of silver following public reports of Maguire's emails and the CFTC's investigation corroborate the existence of Defendants' manipulative scheme. During the period March 2008-present, silver was priced at abnormally low

levels compared to gold. In 2008, the gold/silver ratio spiked to over 80/1, a historically abnormal disparity. Since allegations of artificial suppression by the Defendants emerged, however, the price of silver has risen dramatically compared to the price of gold. The current ratio is approximately 47/1. Because silver and gold are both precious metals, this strong price increase by silver since he allegations of Defendants' manipulation began to surface strongly suggests that artificial forces were holding the price of silver down. All facts known to date point to market manipulation by JP Morgan and HSBC.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

84. Defendants' manipulation and conspiracy are inherently self-concealing. Defendants' trades and positions are not public information. Defendants did not disclose their illicit agreement to manipulate prices to the public.

85. Defendants concealed the existence of their agreement and their participation in the conspiracy.

86. Because of Defendants' concealment and secrecy, Plaintiff and Class members were misled into believing that silver market prices, while low, were the product of market conditions and economic events.

87. Neither Plaintiffs nor the Class knew or could have known that they were injured or who injured them until, at the earliest, March 2010, when certain events were made public as alleged herein. In particular, it would have been impossible for Plaintiffs and the Class to know that silver prices were *artificially* low (versus just "low") at the times they traded, much less that this artificiality was

caused by Defendants. Neither Plaintiffs nor the Class could have discovered the unlawful acts alleged herein by the exercise of reasonable diligence, and this complaint was filed within the applicable statutes of limitations.

88.     The facts giving rise to this lawsuit were not known and could not in the exercise of reasonable diligence have been known until October 2010 when, for the first time, an official from the CFTC acknowledged manipulation of the Silver market.

89.     There are many reasons why these facts could not have been known:

(1)     Defendants trades and trading strategies are not public information;

(2)     Defendants traders and trading managers are held to strict confidentiality standards;

(3)     Government regulators do not publish information linking trades to traders even though they collect the information;

(4)     Exchanges do not publish information concerning particular trading entities, even though they have ready access to the information;

(5)     The cross-exchange nature of the trades at issue further obscures what Defendants are doing at any particular time;

(6)     The advent of electronic and high frequency trading exacerbates the problem because, rather than having a group of market participants in a "pit" together engaging in open-outcry bids, offers and trades, trading is now anonymous with the only glimpse being volumes and prices appearing on the computerized bid-offer ladder or matrix.

## CLASS ACTION ALLEGATIONS

90.     Plaintiffs' claims are capable of class wide litigation because they involve standardized silver financial instruments that carry uniform obligations,

trade in an otherwise efficient (except for Defendants' manipulation) market and are priced based upon common factors.

91.     The Class is so numerous that joinder of all members is impracticable. Exchange-traded silver bar financial instruments trade electronically throughout the United States, and Class members are geographically dispersed throughout the United States.

92.     Millions of exchange-traded silver bar financial instruments trade each day, and common sense dictates that Class members are too numerous to be joined in a single action.

93.     Plaintiffs' claims are typical of the Class they seek to represent. Plaintiffs allege the same factual theory (suppression and downward manipulation of silver bar product prices) and the same legal theories (violation of the Sherman Act, the Securities Exchange Act and the Commodities Exchange Act) as the rest of the Class.

94.     Plaintiffs suffered the same injuries and damages as the rest of the Class when they sold long positions at artificially depressed prices.

95.     Because the markets are economically integrated, Plaintiffs will have to present the same evidence and economic analysis as the rest of the Class.

96.     Plaintiff will adequately represent the Class.    Plaintiffs have no conflicts of interest with the Class they seek to represent.    Plaintiffs have retained counsel with extensive experience prosecuting class actions, including class actions involving antitrust, securities and commodities claims.

97.     Common questions of fact and law exist, and these questions predominate over any questions affecting only individual class members.   These questions include:

1.      Whether Defendants agreed, combined and/or conspired to restrain trade and suppress the price of exchange-traded silver bar financial instruments;

2.      Whether Defendants' conduct had an actual anticompetitive effect on prices of exchange-traded silver bar financial instruments;

3.      Whether Defendants acted with the intent to artificially suppress prices of exchange-traded silver bar financial instruments;

4.      Whether Defendants had the ability to artificially suppress prices of exchange-traded silver bar financial instruments;

5.      Whether Defendants in fact caused artificial suppression of exchange-traded silver bar financial instruments.

6.      The appropriate measure of damages caused by Defendants' conduct.

98.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because, among other things:

a.      The claims at issue are claims are very expensive to prosecute, making individual actions cost-prohibitive even where a class member's damamges are substantial.    In addition to the normal costs of discovery, in these types of cases, sophisticated economic and econometric analysis is necessary, and these costs alone discourage individual actions.

b.      Separate actions will also impose needless repetition and undue burden on the Courts and Defendants and would create the risk of inconsistent or varying adjudications of common questions.

c.      Individual Plaintiffs do not have a practical interest in controlling their own individual actions. Any such interest is theoretical and outweighed by cost issues.

d.    Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

e.    Concentrating the claims in this District is desirable because many of the acts took place through CME/GLOBEX, which is based in this District.

## COUNT I
## VIOLATION OF THE SHERMAN ACT

99.    Defendants violated Section 1 of the Sherman Act, 7 U.S.C. § 1.

100.    To the extent that proof of a relevant market is required in this case, the relevant market is the market for exchange-traded silver bar financial instruments, including NYSE-Arca instruments (SLV and SIVR shares and options) and CME/COMEX instruments (SI futures and options).

101.    Defendants had market power in the relevant market during the Class Period and as a consequence of that market power had the ability to artificially suppress and influence prices.

102.    Defendants conspired to artificially suppress, manipulate downward, fix, and/or maintain the prices of exchange-traded silver bar financial instruments during the Class Period. As explained above, Defendants are counterparties to contracts involving silver, major participants in the NYSE-Arca, CME/COMEX and LBMA silver markets, and members of various industry associations, and their mutual involvement in the market and affiliations in industry organizations provided them with ample opportunity to collude regarding silver prices and trades.

103.    In furtherance of the conspiracy, Defendants: (a) participated in meetings and/or communications with the objective of artificially suppressing the

prices of exchange-traded silver bar financial instruments and supporting each others' positions and trades in those instruments; and (b) executed trades the purpose and affect of which was to cause artificial suppression of exchange-traded silver bar financial instruments. As a direct and proximate result of Defendants' conduct, the prices of exchange-traded silver bar financial instruments were artificially low, and Plaintiffs and the Class suffered antitrust injury and damages to their business and property when they sold long positions in exchange-traded silver bar financial instruments at artificially low prices.

104.    Plaintiffs and the Class are each entitled to treble damages as well as attorneys' fees and the costs of suit as a result of the Sherman Act violations alleged herein.

## COUNT II
## VIOLATION OF THE SECURITIES EXCHANGE ACT (AS TO CERTAIN ACTS)

105.    Plaintiffs incorporate the foregoing allegations as if set forth fully herein.

106.    To the extent Defendants' acts occurred in connection with NYSE-Arca exchange-traded silver bar financial instruments, Defendants violated the anti-manipulation provisions of Section 9 of the Securities Exchange Act, 15 U.S.C.§78i.

107.    Defendants acted with the specific intent to manipulate prices, and Defendants specifically intended prices to become artificial.

108.    Defendants had the ability to influence prices through their large financial wherewithal and access to and large positions with respect to NYSE-Arca

exchange-traded silver bar financial instruments, and in their roles as custodians and authorized participants of these instruments.

109. During the Class Period, Defendants caused NYSE-Arca silver bar financial product prices to become artificially suppressed in that they were influenced by illicit forces, namely Defendants' manipulative trades and positions in exchange-traded silver bar financial products.

110. Plaintiff and the Class who traded NYSE-Arca exchange-traded silver bar financial instruments suffered damages when they traded at prices that were artificial as a direct and proximate result of Defendants' manipulative trades and positions.

## COUNT III
## VIOLATION OF THE COMMODITY EXCHANGE ACT (AS TO CERTAIN ACTS)

111. Plaintiffs incorporate the foregoing allegations as if set forth fully herein.

112. To the extent Defendants' acts occurred in connection with CME/COMEX exchange-traded silver bar financial instruments, Defendants violated the anti-manipulation provisions of the Section 9(a) of the Commodity Exchange Act, 15 U.S.C. § 13(a). Under Section 22(a) of the CEA, Defendants are liable to Plaintiff and the Class for actual damages, exemplary damages, attorneys' fees and the costs of this litigation. 15 U.S.C. § 25(a).

113. JP Morgan and HSBC knowingly aided and abetted the other's violations of the CEA as alleged herein and are therefore liable to Plaintiff and the

Class for actual damages, exemplary damages, costs and attorneys' fees under Section 22(a)(1), 7 U.S.C. § 25(a)(1).

114.    Defendants acted with the specific intent to manipulate prices, and Defendants specifically intended prices of CME/COMEX exchange-traded financial instruments to become artificial.

115.    Defendants had the ability to influence prices through their large financial wherewithal and access to and large positions in exchange-traded silver bar financial instruments.

116.    During the Class Period, Defendants caused CME/COMEX exchange-traded silver bar financial instrument prices to become artificial in that they were influenced by illicit forces, namely Defendants' manipulative trades and positions in exchange-traded silver bar financial products.

117.    Plaintiffs and the Class members who traded CME/COMEX exchange-traded silver bar financial instruments suffered damages when they traded at prices that were artificially suppressed as a direct and proximate result of Defendants' manipulative trades and positions.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that the Court:

(1)    certify the Class pursuant to Rule 23;

(2)    enter judgment against Defendants finding their conduct unlawful;

(3)    order Defendants to pay Plaintiffs and the Class for actual damages, treble damages, exemplary damages, costs, attorneys' fees, prejudgment interest and all other relief permitted by law;

(4)     enter such further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury for all issues so triable.

Respectfully Submitted,

Dated: December 7, 2010

_s/      Anthony F. Fata_
Jennifer W. Sprengel
Anthony F. Fata
Cafferty Faucher LLP
30 N. LaSalle, Suite 3200
Chicago, Illinois 60602
(312) 782-4880
afata@caffertyfaucher.com

Bryan L. Clobes
Ellen Meriwether
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103
(215) 864-2800

_**Counsel for Plaintiffs and**_
_**Proposed Class Counsel**_

## <u>SWORN CERTIFICATION OF PLAINTIFF</u>

I, Arthur Tonelli, hereby declare the following:

1.     I have reviewed the complaint in this case and have authorized its filing.

2.     I did not purchase the securities that are the subject of the complaint at the direction of counsel or to participate in any lawsuit or private action arising under the Securities Exchange Act.

3.     I am willing to serve as a class representative on behalf of a class and will provide testimony at deposition and trial, if necessary.

4.     My transactions in SLV during the period March 1, 2008 to the present are set forth in the attached "Summary of Trades – Tonelli."

5.     During the three year period preceding today's date, I have not sought to serve as a representative of a class.

6.     I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____     12-01-2010
Arthur Tonelli                                        Date

| Summary of Trades Date | Trade | Tonelli SLV Instr. | Exp(Strk) | Quantity | Trade Price |
|---|---|---|---|---|---|
| 1/14/08 | BOT | Share | | 100 | 161.55 |
| 3/19/08 | BOT | Share | | 200 | 181.09 |
| 5/29/08 | BOT | Share | | 600 | 104.00 |
| 7/1/08 | SLD | Share | | 300 | 179.00 |
| 7/15/08 | SLD | Share | | 300 | 191.00 |
| 7/24/08 | BOT | Share | | 300 | 17.30 |
| 7/30/08 | BOT | Share | | 3000 | 16.74 |
| 8/5/08 | BOT | Share | | 3000 | 16.40 |
| 8/11/08 | BOT | Share | | 3000 | 14.45 |
| 3/24/09 | BOT | Put | 04/09 (13) | 20 | 0.40 |
| 3/23/09 | BOT | Call | 04/09 (15) | 20 | 0.25 |
| 3/23/09 | BOT | Put | 04/09 (13) | 20 | 0.40 |
| 3/23/09 | BOT | Call | 04/09 (15) | 20 | 0.25 |
| 4/2/09 | SLD | Put | 04/09 (13) | 10 | 0.80 |
| 4/17/09 | SLD | Put | 04/09 (13) | 10 | 1.20 |
| 5/29/09 | SLD | Call | 05/09 (16) | 10 | 0.35 |
| 9/3/09 | SLD | Call | 9/09 (16) | 10 | 0.50 |
| 9/8/09 | SLD | Call | 10/09 (17) | 20 | 0.65 |
| 9/11/09 | SLD | Call | 9/09 (15) | 10 | 1.65 |
| 9/18/09 | SLD | Share | | 1000 | 15.00 |
| 9/18/09 | SLD | Share | | 1000 | 16.00 |
| 9/29/09 | BOT | Put | 10/09 (15) | 4 | 0.10 |
| 10/8/09 | SLD | Call | 10/09 (16) | 30 | 1.40 |
| 10/16/09 | SLD | Share | | 3000 | 16.00 |
| 10/16/09 | SLD | Share | | 2000 | 17.00 |
| 9/10/10 | SLD | Share | | 2000 | 19.44 |